**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AXA EQUITABLE LIFE INSURANCE CO. | : |
| v. | :     Civil No. CCB-09-1380 |
| RENEE ANDERSON, *et al*. | : |

**MEMORANDUM**

Now pending are cross-motions for summary judgment by Renee Anderson and her brother Ronald Anderson in this dispute over the distribution of life insurance policy proceeds from their mother, Annette Morrison. The court has allowed limited discovery on the question of whether a constructive trust should be imposed on the proceeds claimed by Mr. Anderson, and the issues have been fully briefed. No hearing is necessary. *See* Local Rule 105.6. For the following reasons, Ms. Anderson's motion for summary judgment will be granted, and Mr. Anderson's motion will be denied.

**I.   BACKGROUND**

A previous memorandum and order of this court describes the facts of this case and the relevant procedural posture. (ECF Nos. 29 & 30.) In order to provide a background sufficient to understand the motions for summary judgment, the history is repeated here in part.

Annette Morrison purchased a life insurance policy (the "Policy") for herself from AXA Equitable on or about April 16, 1991. Ms. Morrison named her daughter, Renee Anderson, as the sole beneficiary of the Policy. Although AXA Equitable allowed insured individuals to change their

designated beneficiaries by written notice, AXA Equitable never received any written request from Ms. Morrison to change the beneficiary of her Policy. Ms. Morrison passed away over seventeen years later, on August 16, 2008, and Ms. Anderson submitted a claim for benefits on August 25, 2008. The proceeds of the Policy total $108,361.58.

Upon Ms. Morrison's death, Ronald Anderson, who is Ms. Morrison's son and Ms. Anderson's brother, submitted a claim for benefits as well. Mr. Anderson does not contest that Ms. Anderson was originally named the sole beneficiary under the Policy. He claims, however, that Ms. Morrison never intended Ms. Anderson to receive all of the proceeds of the Policy. Rather, he alleges, Ms. Morrison named Ms. Anderson as the sole beneficiary because Mr. Anderson was incarcerated at the time, and the family feared that his interest could therefore be at risk. The solution, therefore, was for Ms. Anderson to be named as the sole beneficiary, but under the understanding that she would split any proceeds with her brother.

In addition, Mr. Anderson claims that his mother intended to, tried to, or in fact did change the Policy to either include him as a beneficiary or make him the sole beneficiary. In his initial communications with AXA Equitable after Ms. Morrison's death, Mr. Anderson claimed that his mother had changed the Policy to include him and his aunt as beneficiaries, but that Ms. Anderson must have changed the Policy back without their mother's knowledge or consent. (Pl.'s Compl. Ex. 3, ECF No. 1.) He later asserted that Ms. Morrison at least *intended* to change the Policy to include him as a beneficiary and, at one point, was driven to the insurance company's office for the purpose of doing so. (Mr. Anderson's Answer & Cross-cl. 22–24, 26, ECF No. 12.)

Mr. Anderson further alleged, in his communications with AXA Equitable and in his briefing earlier in this case, that Ms. Anderson admitted to him during a phone conversation that she had

2

purposely lied to their mother when allegedly promising to share the life insurance proceeds. Mr. Anderson was in prison at the time, and according to Mr. Anderson, this conversation was recorded by prison officials.

After receiving Mr. Anderson's communications, AXA Equitable filed a lawsuit in the U.S. District Court for the District of Columbia on January 12, 2009, to interplead Mr. and Ms. Anderson's claims under the Policy. The case was transferred to this court on May 15, 2009. AXA Equitable paid the proceeds of the Policy to the Clerk of this court and was dismissed from the lawsuit with prejudice on December 23, 2009. On October 20, 2009, Mr. Anderson filed a motion for an order to compel Ms. Anderson and AXA Equitable to respond to his discovery requests. On November 20, 2009, Ms. Anderson moved for summary judgment, arguing that the court should deny Mr. Anderson's cross-claim for the Policy's proceeds. On June 4, 2010, the court granted Ms. Anderson's motion in part and denied it in part, leaving to be decided only Mr. Anderson's request for imposition of a constructive trust. The court also granted Mr. Anderson's motion to compel Ms. Anderson to respond to discovery for the limited purpose of obtaining her authorization to access recordings of the alleged phone calls. Finally, having concluded that Mr. Anderson only claimed half of the Policy proceeds, the court released $50,000 to Ms. Anderson and her counsel on August 5, 2011. As a result, only $58,361.58 remains at issues in this case.

Pursuant to the discovery compelled by the court, the Bureau of Prisons released two phone call recordings to Mr. Anderson. The parties also completed depositions of Mr. Anderson; Ms. Anderson; Ms. Morrison's brother, James Frazier; Ms. Morrison's sister, Marguerite Peach-Moore; and Ms. Morrison's friend, Grace Barnhart. Based on this new evidence, Mr. Anderson and Ms. Anderson have filed competing motions for summary judgment.

The two phone call recordings Mr. Anderson procured from the Bureau of Prisons do not, as Mr. Anderson alleged, contain a statement by Ms. Anderson that she lied to her mother. However, the two calls do contain statements that are relevant to Mr. Anderson's claim that a constructive trust should be imposed, and Mr. Anderson bases his motion for summary judgment in part on the recordings.

During the August 19, 2008, phone call in which Ms. Anderson advised Mr. Anderson of their mother's death, the two also discussed the Policy. The transcript reads:

MS. ANDERSON: . . . I was talking to the insurance people and stuff like that.

. . .

MR. ANDERSON: So what did they say about her money? Because she told me she had it in there.

MS. ANDERSON: What money?

MR. ANDERSON: She left me some money and she left you some money.

MS. ANDERSON: Oh yeah, yeah. That's all good. And um, you tell me how you want yours done and I'm going to do it. (Inaudible).

MR. ANDERSON: How much – what did she tell you she left?

MS. ANDERSON: I don't know all of that.

MR. ANDERSON: I'm saying, but she left. I'm going to tell you what she said. Like she said man, she told me, she said man, she left me – she said she left the whole $90,000 to me, right.

MS. ANDERSON: Uh-hum.

MR. ANDERSON: She told me – that's what she told me. She said for real, she wanted to give Charlie some money. And she told me to make sure I give you $20,000.

MS. ANDERSON: Uh-hum.

4

> MR. ANDERSON: That's what she told me. She said I'm going to give you the most (inaudible) because she said you're locked up and you can use it when you come home. That's what she told me, right?
>
> MS. ANDERSON: Uh-hum.
>
> MR. ANDERSON: And she wanted to give Charlie $5,000. She wanted to give Charlie $10,000, but then she changed her mind. Then she turned back around and said she ain't going to give her nothing after what Charlie did.
>
> MS. ANDERSON: Uh-hum. Well, hey. All I know –
>
> MR. ANDERSON: What I'm going to do –
>
> MS. ANDERSON: All I know is me and your thing is on there. And that's all. That's about all I'm going to do. All I'm going to do is go ahead and bury her. I don't really know what's on there.
>
> MR. ANDERSON: I'll have to talk to the insurance man.

(August 19th Tr. 7–9, ECF No. 61-1.) Later in the conversation, after discussing the division of their mother's personal property, Ms. Anderson stated "I'm not doing no more than what I have to do. All I'm concerned is giving you what you need or whatever. And that's it. I'm not worried about nobody else." (*Id.* at 18.)

The second phone call that was recorded took place on August 21, 2008. On that call, the relevant portion of the transcript reads:

> MR. ANDERSON: So hey, so what, are we going down half on the funeral?
>
> MS. ANDERSON: What do you mean are we going down –
>
> MR. ANDERSON: I mean, I'm just saying, how much money are you going to give me?
>
> MS. ANDERSON: (Inaudible).
>
> MR. ANDERSON: I mean after it's over with.
>
> MS. ANDERSON: Whatever is left, I'm going to split it down the middle.

5

(August 21st Tr. 8, ECF No. 61-1.)  Later in the call, Mr. Anderson discussed what he planned to do with the money:

> MR. ANDERSON:  I'm going to put the majority of all my money – I'm going to take about – whatever you send me – because that's supposed to give me about $40,000 she say, right?  And if that's just what you send me, I'm going to take $35,000 of that and put it in a CD.  I'm going to take $5,000, that s**t's going to have to last me until I get out of here.
>
> . . .
>
> MR. ANDERSON:  I'm not going to do, you know.  If I spend that, run through that s**t like that, I don't deserve to have nothing in here.
>
> MS. ANDERSON: Um-hum
>
> MR. ANDERSON:  You feel what I'm saying?
>
> MS. ANDERSON: I sure do.
>
> . . .
>
> MR. ANDERSON:  So when I get out man, I'm going to have me some money.  You see what I'm saying?  I'm going to have myself a little place to stay and everything.

(*Id.* at 20–21.)

Mr. Anderson alleges that a third phone call took place on August 31, 2008, in which Ms. Anderson reneged on her statement that she would give Mr. Anderson half of the policy proceeds remaining after the funeral.  The alleged third call, however, "never got recorded" because of "negligence" by prison authorities.  (Mr. Anderson Dep. 27, ECF No. 55-5.)  According to Mr. Anderson, prior to that call his sister had found a letter that Mr. Anderson had written for his mother to sign in order to reform the Policy and make *him* the sole beneficiary instead of his sister.  And on that alleged third call, Ms. Anderson had said "Oh, yeah, since you and mom didn't want me to have s**t, I'm going to make sure you don't get s**t when you come outta here."  (*Id.* at 17.)

6

In addition to the transcripts of the first two phone calls, Mr. Anderson bases his request for a constructive trust on his own deposition testimony. In his motion for summary judgment, Mr. Anderson contends Ms. Morrison, prior to buying the policy, told him and his sister that Ms. Morrison was planning to get the policy and "you all just split the money if something happen [sic] to me." (*Id.* at 28.) Later, when Mr. Anderson was in prison, sometime between 2000 and 2003, Ms. Morrison spoke with both him and his sister by telephone at the same time and "reminded Renee that she needed to 'look out for her brother' to which Renee Anderson responded 'I'm going to look out for him. You ain't got to worry about that. I got him.'" (Mr. Anderson's Statement of Material Facts Not in Dispute 2, ECF No. 59-1 (quoting Mr. Anderson Dep. 72, ECF No. 59-5.)).

Mr. Anderson also highlights deposition testimony of Mr. Frazier and Ms. Peach-Moore. According to Mr. Frazier, in about 1995 or 1996, Ms. Morrison spoke to him and told him she had taken out a policy "for Renee to take care of and split it with Fat Man [Mr. Anderson]." (Frazier Dep. 22–24, ECF No. 59-3.) And, according to Ms. Peach-Moore, sometime between 2006 and 2007 Ms. Morrison stated to her that "she wanted to make sure her policy was right because . . . she wanted to make sure Ronald when he got out of jail, he was taken care of." (Peach-Moore Dep. 16–17, ECF No. 59–4.)

Ms. Peach-Moore also alleges that she drove Ms. Morrison to AXA Equitable's office in 2006 or 2007 when Ms. Morrison had said that she wanted to change her beneficiary designation. When Ms. Peach-Moore was asked whether she knew if Ms. Morrison had in fact made the change, she answered that "[Ms. Morrison] was in the insurance office with Mr. Vasquelez or whatever his name is and I was sitting out. And then when she came out, she had papers and she said she had to take care of this." (*Id.* at 17.)

On the basis of the above evidence, Mr. Anderson argues that the record "is replete with

7

evidence that Annette Morrison purchased the life insurance policy and named Renee Anderson beneficiary intending that Ms. Anderson share the proceeds of the policy with her brother Ronald Anderson." (Mr. Anderson's Mot. for Sum. J. 2, ECF No. 59-2.)  As a result, he argues, a constructive trust is appropriate and necessary because "Ms. Anderson's refusal to share the proceeds of the policy is both deceitful, duplicitous, and in violation of her mother's trust and the fiduciary duty owed to her brother." (*Id.* at 3.)  Ms. Anderson argues that despite all of the discovery allowed, Mr. Anderson has still failed to produce evidence that she in any way deceived her mother or that there was an agreement with her mother to split the insurance proceeds.

## II. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d

514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

"When both parties file motions for summary judgment, the court applies the same standards of review." *Loginter S.A. Y Parque Indus. Agua Profunda S.A. Ute v. M/V NOBILITY*, 177 F. Supp. 2d 411, 414 (D. Md. 2001) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). "The role of the court is to 'rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* (quoting *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985)).

### III. DISCUSSION

At issue is whether the evidence Mr. Anderson has submitted is sufficient to allow the court to impose a constructive trust.[1] The remedy of a constructive trust is "a flexible remedial device used to force restitution in order to prevent unjust enrichment," *Hertz v. Klavan*, 374 A.2d 871, 873 (D.C. 1977), and the remedy "can be imposed wherever one unfairly holds title or a property interest

---

[1] The court previously concluded that a constructive trust was the only potential remedy in this case because, among other reasons, Mr. Anderson relied solely on parol evidence that would otherwise be barred from consideration. (ECF No. 29, at 6–7.) "Since a constructive trust is found for the purpose of preventing humans from being successful in shady bits of behavior, it is universally recognized that the required operative facts can be proved by parol. . . ." *Hertz v.*

and where the holder would be unjustly enriched if permitted to retain such interest." *Gray v. Gray*, 412 A.2d 1208, 1210 (D.C. 1980) (internal quotation marks and citation omitted).[2] However, a constructive trust may be "limited to cases of wrongdoing" in cases where the statute of frauds applies. *See* 1 Dan B. Dobbs, Law of Remedies § 4.3(2), at 598–99 (2d ed. 1993). For example, the D.C. Court of Appeals has declined to impose a constructive trust over life insurance proceeds where the party requesting the remedy failed to show that the legal right to the proceeds was acquired "by guile, deceit or subterfuge." *Bolle v. Hume*, 619 A.2d 1192, 1197 (D.C. 1993).[3]

Typically, a constructive trust must be justified with proof by clear and convincing evidence. *See* Dobbs, *supra*, § 4.3(2), at 590–91. This is particularly true with regard to life insurance contracts. Where one party "was unequivocally designated beneficiary [on the form], 'her right to take is protected unless there is *convincing evidence*' to the contrary." *Bolle*, 619 A.2d at 1197 (emphasis added) (quoting *Mayberry v. Kathan*, 232 F.2d 54, 55 (D.C. Cir. 1956)). The rule may be somewhat different if a confidential relationship is shown, in which case the burden shifts "to the defendant to show the fairness and reasonableness of the transaction." *Wimmer v. Wimmer*, 414 A.2d 1254, 1258 (Md. 1980).[4] But Mr. Anderson does not allege the existence of a confidential relationship, and the facts of this case do not indicate one. Thus the proper standard in this case is clear and convincing evidence, with the burden on Mr. Anderson.

---

*Klavan*, 374 A.2d 871, 873 (D.C. 1977) (quoting 4A Powell on Real Property § 594, at 567 (1974)).

[2] As discussed in the court's previous memorandum in this case, the law of the District of Columbia applies here because the Policy was delivered to Ms. Morrison's residence in the District of Columbia and all premiums were paid in the District.

[3] The court in *Bolle* did not expressly hold that a court *must* find guile, deceit or subterfuge in order to impose a constructive trust over life insurance proceeds, rather the court simply implied that such a finding would be sufficient. *Bolle v. Hume*, 619 A.2d 1192, 1197 (D.C. 1993). Mr. Anderson has argued that Ms. Anderson did in fact induce her mother to name her as sole beneficiary through deceitful or otherwise wrongful conduct. (Mr. Anderson's Mot. for Sum. J. 3, ECF No. 59-2.)

[4] "Because the District of Columbia 'derives its common law from the state of Maryland,' courts applying D.C. law may look to Maryland law when there is no controlling D.C. authority directly on point." *Chen v. Bell-Smith*, 768 F.

As an initial matter, Ms. Anderson challenges Mr. Anderson's use of the deposition testimony, alleging that references to Ms. Morrison's out-of-court statements should be excluded as hearsay under Federal Rule of Evidence 802. Mr. Anderson does not provide any explanation for how the evidence could fit within one of the hearsay rule exceptions, nor does he address the argument in any way. Nonetheless, even if the court considers the contested hearsay testimony, Mr. Anderson still does not provide sufficient evidence to meet the clear and convincing standard of proof were this case to go to trial.

Mr. Anderson argues that Ms. Morrison "clearly expressed her intentions" to Ms. Anderson that the two siblings were to share in the insurance policy proceeds. (Mr. Anderson's Mot. for Sum. J. 3.) Therefore, he argues, Ms. Anderson's refusal to share the proceeds of the policy is "deceitful, duplicitous, and in violation of her mother's trust and the fiduciary duty owed to her brother." (*Id.*) Mr. Anderson does not, however, provide sufficient evidence for a court to conclude that Ms. Morrison "clearly expressed her intentions" beyond the explicit designation of Ms. Anderson as sole beneficiary, nor that Ms. Anderson engaged in deceitful conduct or breached a fiduciary duty. While the phone call recordings contain evidence that Ms. Anderson may have intended at some point to split the proceeds with her brother, they are not persuasive evidence that Ms. Anderson promised to do so in order to secure or maintain her status as sole beneficiary of the Policy—thus creating a fiduciary duty or suggesting deceit. Similarly, none of the affidavits or deposition testimony are specific enough to provide a basis for concluding that Ms. Anderson induced her mother to make her the sole beneficiary through guile, deceit, or subterfuge.

Mr. Anderson concedes that the telephone records do not—as he originally alleged—contain

---

Supp. 2d 121, 134 (D.D.C. 2011).

recordings of Ms. Anderson admitting that she lied to her mother in order to become the sole beneficiary.  Nor do the phone records contain any statement, either by Mr. Anderson or Ms. Anderson, that confirms Ms. Anderson promised her mother she would split the insurance proceeds.  The strongest evidence on the calls is Ms. Anderson's statement that she planned to "split . . . down the middle" whatever was left of the Policy proceeds after the funeral expenses were taken care of.  But even this statement is not evidence that Ms. Anderson's expressed intention to give Mr. Anderson some of the proceeds stemmed from any agreement with her mother.

The deposition testimony similarly falls short.  Mr. Frazier testified that, in about 1995 or 1996, Ms. Morrison told him she had taken out a policy "for Renee to take care of and split it with Fat Man [Mr. Anderson]."  (Frazier Dep. 22–24, ECF No. 59-3.)  But this is a recollection of a twelve-year-old out-of-court statement, and Frazier's language lacks the specificity that would allow the court to make the necessary inference.  Even if the court were to admit this hearsay statement, the statement does not explicitly support the allegation that Ms. Anderson had agreed to split the proceeds in order to be named the beneficiary.  Mr. Frazier also testified that Ms. Anderson had never told him that she was being left life insurance proceeds or that she had agreed to split them with her brother.  (Frazier Dep. 53–54, ECF No. 55-11.)

More importantly, the evidence of Ms. Morrison's conduct supports Ms. Anderson's version of the story.  Ms. Peach-Moore testified that she took Ms. Morrison to the insurance office to change the Policy beneficiary designation and that Ms. Morrison had left with some paperwork to fill out.  But Mr. Anderson admits that Ms. Morrison never did make the change, and Ms. Peach-Moore admits that Ms. Morrison never told her how she wished her Policy proceeds to be split.

> MR. LEBOWITZ:  And is it fair to say that at no time from the time [Annette Morrison] took out the policy till the time of her death did she ever specifically tell

you who the beneficiary was under the policy?

MS. PEACH-MOORE: No.

MR. LEBOWITZ: And is it also fair to say that at no time between the time she took out the policy until the time of her death Annette Morrison never told you how she wished her life insurance proceeds to be split?

MS. PEACH-MOORE: No. I know she just wanted -- I know she wanted a Catholic funeral . . . .

MR. LEBOWITZ: Okay. So the only thing you knew about the life insurance policy proceeds of Annette Morrison, your sister, was that she wished the proceeds to be used to pay for a proper funeral and burial; is that correct?

MS. PEACH-MOORE: Catholic funeral.

MR. LEBOWITZ: Catholic funeral, correct?

MS. PEACH-MOORE: Correct.

MR. LEBOWITZ: And you did not know beyond that if there was any additional money left on the life insurance policy how it was to be split; is that correct?

MS. PEACH-MOORE: Correct.

(Peach-Moore Dep. 39–41, ECF No. 55–4.) Thus, even if Ms. Peach-Moore's testimony is accurate, the most that can be inferred from it is that Ms. Morrison at one time procured the paperwork for a policy change she ultimately did not make.

Mr. Anderson's own testimony confirms that he repeatedly—and unsuccessfully—attempted to persuade his mother to change the beneficiary designation:

Q. [Y]ou testified that you did speak to your mother and you did tell Annette Morrison to change the beneficiary --

A. To change --

Q. -- under the life insurance policy, is that correct?

A. Yes, I told her that.

13

>    Q.  And how many times did you tell her, Change the beneficiary from Renee Anderson to me, Ronald Anderson?
>
>    A.  I told my mother that about -- about -- several times.

(Mr. Anderson Dep. 36–38, ECF No. 55-5.)  It appears from Mr. Anderson's testimony that he began requesting the change in 2006, and he continued the requests until the week Ms. Morrison passed away.[5]

As a final note, Mr. Anderson does not allege that his mother was incompetent or otherwise unable to make the beneficiary change, and the evidence in the record is to the contrary.  Ms. Peach-Moore, for example, testified specifically that Ms. Morrison "handled her own business affairs," and that she "took care of her own bills and everything."  (Peach-Moore Dep. 36.)

Taking all of the evidence as a whole, the court cannot ignore Ms. Morrison's apparent decision *not* to change her policy in the face of requests to do so by her son.  Given the facts as Mr. Anderson has presented them, the most reasonable inference is that Ms. Morrison simply decided the best course of action would be to permit Ms. Anderson to receive the entirety of the Policy proceeds—and to allow Ms. Anderson to determine  whether and how to share it with her brother.  In sum, the record in this case falls far short of the kind of convincing evidence required to outweigh the express language of a contract.  *See, e.g., Gray*, 412 A.2d at 1211 (imposing a constructive trust on a house where various children had, over the years, made maintenance payments and loan carrying charges, and the daughter claiming sole ownership had taken "no action indicating her assertion of sole ownership" for five years after the death of the mother).

---

[5] Mr. Anderson's testimony and court filings alternately advance various and inconsistent versions of how the money was to be divided and whether his sister (who had become blind or visually impaired) was to care for him or he was to care for her.  The one constant in all of these versions is that Mr. Anderson repeatedly and unsuccessfully asked his mother to change the policy beneficiary designation from his sister to himself.

14

Here, even after subpoenaing phone records from the Bureau of Prisons and completing exhaustive depositions of all of the relevant witnesses in the case, the evidence Mr. Anderson has produced is not sufficient to support the inference that Ms. Anderson has breached a prior agreement with her mother or that she has otherwise engaged in deceitful conduct. Even viewed in a light most favorable to Mr. Anderson, the record here falls far short of providing the clear and convincing evidence required for the imposition of a constructive trust. Accordingly, no genuine issue of material fact remains to be determined at trial, and Ms. Anderson's motion for summary judgment must therefore be granted and Mr. Anderson's motion denied.

## IV. CONCLUSION

The court recognizes that the outcome in this case may seem unfair to Mr. Anderson. It may be that Ms. Anderson should share the proceeds of the Policy with him simply because she is his sister. However, "[w]hile the imposition of a constructive trust is a remedy which may be applied to correct a broad spectrum of inequitable conduct, it is not . . . a remedy for every moral wrong arising in societal affairs." *Wimmer*, 414 A.2d at 1261. For the reasons explained above, the evidence in the record does not allow the court to alter the express written direction of the Policy owner.

A separate order follows.

May 23, 2012                               /s/
Date                                  Catherine C. Blake
                                      United States District Judge

15